## Case No. 9,481.

### MERRIMAN v. The MAY QUEEN.

[Newb. 464.] [1]

District Court, E. D. Louisiana. April, 1854.

CARRIERS—DAMAGE TO GOODS—PRIMA FACIE LIABILITY—NOTICE LIMITING—AGREEMENT—SHIPPER—GROSS NEGLIGENCE.

1. When loss or damage happens to goods while in the possession of a common carrier, the onus probandi is on the carrier to exempt himself from liability; for prima facie the law imposes upon him the obligation of safety.

2. In cases where the carrier has given notices qualifying or limiting his liability, the burden of proof of negligence is on the shipper, not of diligence on the carrier. This is contrary to the general rule where there is no notice.

3. A common carrier may qualify his liability by a general notice to all, of any reasonable requisition to be observed, as to the manner of delivery, entry of parcels, information of contents, rates of freight, and the like.

4. A common carrier cannot, by a general notice, limit, restrict or avoid the liability devolved on him by the common law, or the salutary grounds of public policy.

5. A common carrier's liability may be limited or restricted by an express agreement between the parties; but he cannot do so by any act of his own. It requires the assent of the parties concerned; and this is not to be inferred or implied from a general notice to the public; nor is it to depend upon doubtful or conflicting evidence, but it should be specific and certain, leaving no room for controversy between the parties.

6. Where a bill of lading had stamped upon it "Goods to be receipted for on the levee—not responsible for rust, breakage, leakage, cooperage—weight and contents unknown," and the witness who received the goods stated "that the vessel would not be responsible for breakage," this is not such a certain and specific contract as is required to free the carrier from liability.

7. Where an individual residing in Philadelphia was employed by a firm in Memphis, Tennessee, to construct glass cases, and from abundant caution superintended their shipment, he is in no legal or just sense the shipper, nor could he bind the owner by any contract he might enter into of so important a character as would exempt the vessel from the usual and well established responsibilities of a common carrier.

8. But even if an express agreement has been entered into, limiting the responsibility of the carrier, such a contract could not be pleaded as an exemption from liability for any loss or damage resulting from gross negligence or misfeasance of the master or his servants.

[Cited in Steele v. Townsend, 37 Ala. 247.]

9. Where the officers of a vessel knew perfectly well the contents of certain boxes to be glass cases, a failure to observe every precaution necessary to insure their safe stowage and safe delivery must be *held* gross negligence.

10. A protest cannot be received in our courts as evidence for the master or owner, but may be evidence against him and them.

[This was a libel in rem by Charles G. Merriman against the brig May Queen.]

---

[1] [Reported by John S. Newberry, Esq.]

Clarke & Bayne, for libelants.
Durant & Hornor, for respondent.

McCALEB, District Judge. The libelant has instituted this action in rem to recover the damages sustained by him in consequence of the failure on the part of the officers of the brig to deliver, in the like good order in which they were received on board, four glass counter cases, which were shipped by J. E. Caldwell & Co., in the port of Philadelphia, to be delivered to Wright, Williams & Co., at this port. The shipment was made on the 9th of August last, as appears by the bill of lading. There were five cases put on board the brig, and one, only, was delivered in good order. The other four were found, immediately after they were taken from the vessel and placed upon the levee, to be broken in pieces and utterly worthless. The libel alleges this breakage to have been caused by the careless, negligent and improper manner in which said cases were stowed and handled by the officers and crew of the brig. The answer of the respondents denies the allegations of negligence and carelessness, and avers that the brig was not accountable for breakage, and that the contents of the boxes in which the cases were placed were unknown: that they have delivered to the consignees, Wright, Williams & Co., the boxes of cases in the same good order and condition in which they received them on board their vessel: that the outward appearance of the cases of packages was, in all respects, as clean, fresh and new as when they were put on board the May Queen, in the port of Philadelphia. The answer further avers, that the vessel encountered heavy weather on her passage from Philadelphia to New Orleans. On the bill of lading annexed to the libel is stamped the following words: "Goods to be receipted for on the levee; not accountable for rust, breakage, leakage, cooperage; weight and contents unknown." It is upon these words, thus stamped upon the bill of lading, that the proctor of respondents has relied to show such a limitation of responsibility on the part of the vessel as should exempt her from all responsibility for the loss sustained by the breaking of the cases in question.

The issue raised by the pleadings must be determined by the evidence, and by the law applicable to such a case as that evidence presents. And let us first examine the evidence taken under a commission, in the city of Philadelphia, where the cases were shipped.

The witness Beal states that he is a member of the firm of Beal & Forman, who were employed by J. E. Caldwell & Co. to make the five show cases in question. They were made and finished in good order, in every respect. The glass was from a quarter of an inch to three-eighths in thickness, and was of the best quality English plate glass. The cases were packed on Monday, the 8th

of August, and shipped on Tuesday, the 9th. They were packed and shipped in five boxes, each case in a box by itself. The boxes were made by witness' firm, expressly for the cases. The witness himself assisted in packing them. He and three others were engaged in packing them, and they were employed until 3 or 4 o'clock in the afternoon. The wooden or bottom part of the cases were respectively secured fast to the boxes. The glass was then covered with paper, to prevent the straw from scratching the glass, and the German silver mounting, and the sides were then covered and filled in, the straw packed in closely, but not so tight as to cause any pressure. The straw was not packed so as to strain in any place, for the cases were screwed tight, and could not move. The tops were screwed on. The top and bottom were of inch stuff. The witness marked all the boxes himself. He believes they were marked "C. J. Merriman, care of Wright, Williams & Co., New Orleans." Also, in very large letters, on the lid of the boxes, respectively, was "Glass case;" and he thinks, "With care." On the edge of the boxes was written "This side up," or "This edge up." The witness did not deliver the boxes, but his partner did. The cases were so packed that unless they had been jarred or banged in some manner, they could not have been broken. The witness Forman corroborates all that was stated by his partner, in reference to the packing the cases and directing the boxes, and further testifies that he aided in putting the boxes on board the brig. He declared that he engaged four men who were working for the brig, to assist him in placing them in the vessel, and he saw them swung up by a tackle and lowered down between decks. They were placed between the two masts. He went down himself to see that they were handled carefully. They were handled carefully, but they were not finally stowed away when he left them; for the man who was stowing, said that he could not stow them away properly, until he got other goods to stow with them. The clerk, the captain and the mate were there, and he told them of the contents of the boxes, and that if roughly handled, they would be broken. The mate said that he would have the superintending of the taking them out, and that he would see that they were handled carefully. The witness asked particularly if there was any danger of the goods shifting in the vessel at sea. They (the captain and mate) replied there was not. The bill of lading was procured by Caldwell & Co., and the witness never saw it. The evidence of this witness is in many essential particulars sustained by the testimony of Jackson, and the whole taken together leaves no doubt whatever upon my mind that the cases were well made, properly packed, and safely deposited on board the brig. The testimony of the men who aided in putting the boxes on board, has also been taken under a commission, and introduced in evidence by the respondents. It substantially agrees with that of Beal and Forman. The testimony of Pettit, who was engaged in receiving the cargo on board of the May Queen, does not contradict that of Beal and Forman, but proves another fact to which the witness Forman does not allude. It is, that he (Forman) was informed at the time cases were put on board, that the owners would not be responsible for breakage.

The important question to be determined is, does the stamp on the bill of lading, to which reference has already been made, taken in connection with the declarations made by Pettit to Forman, so far limit the responsibility of the vessel, as to exempt her from all liability for the loss? There is no direct evidence to show when or how the breakage was caused. I am, however, perfectly satisfied that it was not caused by any carelessness or want of skill on the part of the witness Forman, and those employed by him, in putting the cases on board, and placing them between decks. Up to the time when they were left by Forman, I am satisfied they were safe and sound. The breakage then, must have occurred after the shipment, and before the boxes were delivered to the consignees on the levee in this city. The testimony of the cartmen shows that the contents of the boxes were broken before they were received into the carts. They were therefore broken while the boxes were in the care and custody of the officers of the vessel, or those employed by them. Whether the breakage was the result of the straining of the vessel, caused by the violence of the wind and waves, or of the carelessness or negligence with which the boxes were finally stowed, or in the handling them when they were delivered upon the wharf, are questions which can be settled by no direct evidence. And so far as the libelant is concerned, it would be difficult, if not impossible, to produce direct proof, if such should be required. The general rule of law is, that in all cases of loss, the onus probandi is on the carrier to exempt himself from liability; for prima facie, the law imposes upon him the obligation of safety. Story, Bailm. § 529. In cases where notices are given by the common carrier for the purpose of qualifying or limiting his responsibility, the burden of proof of negligence is on the party who sends the goods, and not of due diligence on the part of the carrier; which is contrary to the general rule in cases of carriers, where there is no notice. Story, Bailm. § 573. It is now well settled, that a common carrier may qualify his liability, by a general notice to all who may employ him, of any reasonable requisition to be observed on their part, in regard to the manner of delivery and entry of parcels, and the information to be given to him of their contents, the rates of freight and the like; as, for example, that he will not be responsi-

ble for goods above the value of a certain sum, unless they are entered as such, and paid for accordingly. But the right of a common carrier, by a general notice, to limit, restrict or avoid the liability devolved on him by the common law, on the most salutary grounds of public policy, has been denied in American courts, after the most elaborate consideration; and therefore a public notice by stage coach proprietors, that "all baggage was at the risk of the owners," though the notice was brought home to the plaintiff, has been held not to release them from their liability as common carriers. 2 Greenl. Ev. § 215.

But it is contended on behalf of the respondents, that the common law liability of the carrier, has been in this case limited or qualified by an express agreement. The question has often been made, whether it is competent for the carrier to restrict his obligation even by a special agreement. It was very fully considered in the case of Gould v. Hill, 2 Hill, 623, and the conclusion arrived at that he could not. See, also, Hollister v. Nowlen, 19 Wend. 240, and Cole v. Goodwin, Id. 272, 282. The supreme court of the United States, however, in the case of New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, held that as the extraordinary duties annexed to his employment, concern only, in the particular instance, the parties to the transaction, involving simply rights of property, the safe custody and delivery of the goods, no well founded objection to the restriction could be perceived, or any stronger reasons forbidding it than exist in the case of any other insurer of goods, to which his obligation is analogous; and which depends altogether upon the contract between the parties. The owner, by entering into the contract, virtually agrees, that, in respect to the particular transaction, the carrier is not to be regarded as in the exercise of his public employment; but as a private person who incurs no responsibility beyond that of an ordinary bailee for hire, and answerable only for misconduct or negligence. The right thus to restrict the obligation, is admitted in a large class of cases, founded on bills of lading and charter parties, where the exception to the common law liability (other than that of inevitable accident), has been from time to time enlarged, and the risk diminished by the express stipulation of the parties. The right of the carrier thus to limit his liability by the shipment of goods, has never been doubted. But admitting the right thus to restrict his obligation, it by no means follows that he can do so by any act of his own. He is in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself without the assent of the parties concerned. And this is not to be implied or inferred from a general notice to the public limiting his obligation, which may or may not be assented to. He is bound to receive and carry all the goods offered for transportation, subject to all the responsibilities incident to his employment, and is liable to an action in case of refusal. The supreme court of the United States, having expressed these views fully in the opinion referred to, further declare that "the burden of proof lies on the carrier, and nothing short of an express stipulation by parol, or in writing, should be permitted to discharge him from duties which the law has annexed to his employment. The exemption from these duties should not depend upon implication or inference, founded on doubtful or conflicting evidence; but should be specific and certain, having no room for controversy between the parties." The special agreement relied on in this case, arises from the stamp on the bill of lading, and the declarations made by the witness who received the boxes on board, that the vessel would not be responsible for breakage. In regard to the stamp referred to, I confess I cannot attach to it any importance. It seems to have been kept ready for a convenient resort, to limit or qualify the obligations of the ship owner without any notice to the shippers. There is no evidence that the latter in this instance, assented to the limitations of the liability of the former, which it has been attempted to create, by means of this stamp. I am by no means convinced from such evidence, that there has been "such a certain and specific contract between the parties as leaves no room for controversy." The evidence in the cause shows, moreover, that the stamp is false in point of fact. It was not true that the contents of the boxes were unknown. The witness Forman, who put the boxes on board, states, that "the clerk, the captain and the mate were there, and that he told them of the contents of the boxes, and that if roughly handled, they would be broken. The mate replied that he would have the superintending of the taking them out, and that he would see that they were handled carefully. The witness asked particularly if there was any danger of the goods shifting in the vessel at sea. They, the captain and mate, replied, there was not."

But it is urged on behalf of the respondents, that the person who was engaged in receiving cargo on board the May Queen, expressly stated to the witness Forman, that the vessel would not be responsible for breakage. This witness it will be remembered, was the maker of the cases which are the subject of litigation, and from abundant caution, superintended their shipment; but in no just legal sense can he be regarded in the light of the shipper. The consignors and shippers acting for the owner of the cases residing in Memphis, Tennessee, were Caldwell & Co.; and I am aware of no principle of law which will hold them bound by the stipulations of a contract, to which there is no proof they ever assented. It is not shown that Forman had any authority to make on their behalf, a special agreement of so im-

portant a character as would exempt the vessel from the usual and well established responsibilities of a common carrier. It does not appear that the witness assented at all to the declaration on the part of the person who was receiving the cargo; it is perfectly clear that he did not assume authority to make a contract binding upon the shippers; and the court is therefore bound to say that the exemption from liability claimed for this vessel, has been made to depend upon implication or inference founded on doubtful or conflicting evidence; and that it is not of that specific and certain character, which according to the decision of the supreme court of the United States, already referred to, should leave no room for controversy between the parties. But even if we admit that there was a special agreement in this case between the shippers and the owners, by which the liability of the vessel as a common carrier was limited, it has never been held that such a contract could be pleaded as an exemption from responsibility for any loss or damage resulting for gross negligence or misfeasance in the master or his servants. 2 Kent, Comm. 607; Story, Bailm. § 558. It has been satisfactorily shown that these cases were put on board with great care under the superintendence of the witness Forman, and that they were left safe and in good order by him in the custody of the officers of the vessel. If they have not been delivered in like good order and condition, the conclusion is irresistible that the care and caution which were observed in putting them on board, were wanting on the part of those employed in unlading and placing them on the levee. The officers of the vessel knew perfectly well the contents of the boxes, and a failure on their part to observe every precaution necessary to insure their safe delivery, must be regarded as such gross negligence as subjects the vessel to the usual liability for the loss by breakage. The same conclusion must necessarily follow, if after they were left by Forman, they were finally stowed in such a manner as to render them liable to be jostled against other articles by the motion of the vessel.

The proctor for the respondents has relied upon a protest which was made by the second mate of the May Queen, and which was not afterwards extended in consequence of the death of the master, to show that the breakage may have been caused by the perils of the sea. Even if the protest could be received as conclusive evidence of all the facts it contains, there is no fact stated in it, which would justify the court in saying that the damage complained of was caused by the winds and waves, or by any other cause absolutely beyond the control of the officers of the vessel. Such a conclusion would be a mere presumption or inference from a general statement, that at certain intervals of the voyage the vessel experienced hard rain squalls which caused the vessel to labor hard. But whether these squalls actually produced the damage alleged to have been sustained in this case, must be left to conjecture only.

But I am satisfied that his protest cannot be received as evidence to establish the facts for which it was introduced. As a general rule it is difficult to perceive upon what ground such ex parte statements as are contained in protests, can be admitted to determine a controversy between the vessel and the shippers. The latter, having, as in this case, no opportunity of cross-examining the persons who make the statements, can rarely be prepared to counteract the effect which such statements, if admitted, would be calculated to produce. If such evidence could be permitted to prevail in a case like this, the shippers of cargo would be placed at the mercy of those who navigate the vessels upon the high seas, and who by their usually extravagant descriptions of the storms and tempests they encounter, would have it in their power to cause every case of damage involving a doubt, to be ascribed to the perils of the sea. "In a seaman's protest," says Judge Hopkinson in the case of Hand v. The Elvira [Case No. 6,015], "the waves are always mountain high, the winds never less than a hurricane, and the peril of life generally impending. There may be some pride of authorship in these compositions, and the writer may aim to exhibit his power and skill in describing dangers." In the case of The Betsey Caines, 2 Hagg. Adm. 28, the protest by the master attested by two of his seamen, was offered as evidence. It was objected to as quite inadmissible upon the ground that it was res inter alios acta; and Lord Stowell said: "I should be unwilling to allow a protest to be introduced that has been properly described as res inter alios acta. I therefore reject the protest and the article that pleads it." But I consider the authority of Abb. Shipp. 466, as conclusive on this point. "The protest," says that authority, "is a declaration or narrative by the master, of the particulars of the voyage, of the storms or bad weather which the vessels may have encountered, the accidents which may have occurred, and the conduct, in cases of emergency he had thought proper to pursue. With whatever formalities drawn up, it cannot be received in our courts as evidence for the master or his owners; but it may be evidence against him and them, and he should take care to supply from the logbook, his own recollection and that of the mate, or trustworthy mariners, true and faithful instructions for its preparation."

After an attentive examination of the law and evidence in this case, I am satisfied that the libelant is entitled to recover the damage he has sustained in consequence of the breakage complained of; and it is therefore ordered that there be judgment in his favor against the brig May Queen, for the sum of five hundred and sixty dollars, with five per cent. interest from the 17th of October, 1853, and the costs of suit.